UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

THOMAS J. ALLEMAN,                          CIVIL ACTION
individually and on behalf of
his minor children, JUSTIN
ALLEMAN AND KAITLYN ALLEMAN,                NO: 05-1653
ET AL.                                      (c/w 05-1654, 06-
                                            2620, 06-2621 &
VERSUS                                      06-2622)

OMNI ENERGY SERVICES CORP.,
ET AL.                                      SECTION: "R"


**<u>ORDER AND REASONS</u>**

This consolidated litigation arises out of a December 17,

2004 accident that occurred when a helicopter owned and operated

by defendant and third-party plaintiff Omni Energy Services

Corporation attempted to land on an oil production platform on

the outer Continental Shelf in the Gulf of Mexico operated by

W&T.  Plaintiffs Thomas Alleman and Mark and Nancy Parker sued

Omni in this Court on May 4, 2005 for damages arising out the

accident.  Ronald and Mary Fontenot, Sharon Gayle Hebert, and

Brian Lee Hollier, the heirs of Bert Hollier, also sued Omni as a

result of the accident and their actions were later consolidated

with the Alleman and Parker cases.  Omni and its insurer, AIG
Aviation, filed a third-party complaint against W&T Offshore,
Inc., the platform owner, on December 15, 2005.  Omni's third-
party complaint seeks indemnification and defense costs from W&T.
In the alternative, Omni asserts that it is entitled to
contribution from W&T for any judgment against it.

Before the Court are four motions for partial summary
judgment.  The first three are W&T's motions for partial summary
judgment to dismiss the tort-based indemnity and contribution
claims and Rule 14(c) tenders by Omni and AIG regarding the
claims of the Hollier heirs, Alleman, and the Parkers,
respectively.  There is no opposition to these motions.  The
fourth is Omni's motion for partial summary judgment on the issue
of whether the actions before the Court are governed by the Outer
Continental Shelf Lands Act or general maritime law and the Death
on the High Seas Act.

## I.   LEGAL STANDARD – SUMMARY JUDGMENT

Summary judgment is appropriate only when the pleadings and
summary judgment evidence establish that there are no genuine
issues of material fact and that the moving party is entitled to
judgment as a matter of law.  *See* Fed. R. Civ. P. 56(c); *Celotex
Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  The court must be

2

satisfied that no reasonable trier of fact could find for the nonmoving party or, in other words, "that the evidence favoring the nonmoving party is insufficient to enable a reasonable jury to return a verdict in her favor." *Lavespere v. Niagara Mach. & Tool Works, Inc.*, 910 F.2d 167, 178 (5th Cir. 1990) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).  The moving party has the burden of showing that there are no genuine issues of material fact.

If the dispositive issue is one on which the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its burden by merely pointing out that the record contains insufficient proof concerning an essential element of the nonmoving party's claim.  *See Celotex*, 477 U.S. at 325; *see also Lavespere*, 910 F.2d at 178.  The burden then shifts to the nonmoving party, who must, by submitting or referring to evidence, set out specific facts showing that a genuine issue exists.  *See Celotex*, 477 U.S. at 324.  The nonmovant may not rest upon the pleadings, but must identify specific facts that establish a genuine issue for trial.  *See id*. at 325; *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1996).

## II.   FACTUAL BACKGROUND

W&T owns and operates a number of oil and natural gas

3

production leases on the outer Continental Shelf off the coast of
the State of Louisiana.  W&T produces oil and gas at production
platforms on these locations that are permanently attached to the
seabed on the outer Continental Shelf.  To carry out its
operations, W&T contracts with independent contractors, who in
turn provide W&T with necessary personnel, services and equipment
for its oil and gas production activities.

On April 27, 1999, W&T and Omni executed a Master Service
Contract, under which Omni agreed to provide services to W&T.
The MSC, which appears to be a standard form agreement used by
W&T with its subcontractors, sets forth the general terms and
conditions of the parties' relationship, but it provides no
detail about the specific services to be provided by Omni.  In a
March 4, 2004 letter agreement between the parties, Omni agreed
to provide W&T "certain aircraft services" in accordance with the
terms of the MSC, "in support of W&T's production operations."
*See* Hotard Decl. Ex. 2, at 1–2.

On December 17, 2004, Ernie Smith, an Omni pilot, shuttled
personnel of W&T and its subcontractors by helicopter to and from
W&T's various oil and gas production platforms.  Thomas Alleman,
a crane mechanic employed by W&T subcontractor, Danos & Curole
(D&C), and Bert Hollier and Mark Parker, both employees of W&T
subcontractor, Baker Energy Services, rode in the helicopter with

4

Smith.  Smith attempted to land the helicopter on W&T's Ship Shoal 130-E platform so that Hollier and Parker could perform a monthly inspection of the platform's fire equipment.  Alleman was in transit between another platform where he was tasked to repair a crane and the platform where he was quartered, Ship Shoal 149-A; he was not scheduled to disembark aboard the 130-E platform. W&T stored a boat landing on the top deck of the platform, on or near the platform's helipad.  As Smith attempted to land the helicopter on the platform, the helicopter's main rotor struck the boat landing, causing the helicopter to skid in circles across the helipad.  As the helicopter spun, the tail boom fell off the helicopter and into the Gulf of Mexico.  The helicopter momentarily came to rest on the edge of the platform, but ultimately, it too fell from the platform into the Gulf of Mexico, killing Hollier and injuring Alleman and Parker.  These actions ensued against Omni on behalf of the passengers of the helicopter.  In response, Omni sought tort-based indemnity and contribution from W&T.  W&T now moves for partial summary judgment on that claim.

## III. W&T'S MOTION ON OMNI'S TORT-BASED INDEMNITY AND CONTRIBUTION CLAIMS

W&T challenges Omni's tort-based indemnity and contribution

5

claims on the grounds that Alleman, Parker, and Hollier were borrowed servants of W&T, which triggers the exclusive remedy provisions of the Longshore and Harbor Workers Compensation Act (LHWCA), 33 U.S.C. §§ 901-950, and bars recovery of tort-based damages by any of the plaintiffs or Omni against W&T.

### A.    Legal Standard – Borrowed Servant Status

The LHWCA is made applicable to this case by the Outer Continental Shelf Lands Act (OCSLA), 43 U.S.C. § 1333(b), which extends the LHWCA to offshore platforms erected for the purpose of developing mineral resources.  In order for the LHWCA to apply, the injured employee must satisfy both a "situs" requirement and a "status" requirement.  *See Diamond Offshore Co. v. A&B Builders, Inc.*, 302 F.3d 531, 541-42 (5th Cir. 2002). Because the accident occurred on an oil platform affixed to the seabed of the outer Continental Shelf, the situs requirement is met.  *Id.*  Further, because the three injured workers were injured while participating in the development of resources on the outer Continental Shelf, the status requirement is met.  *Id*.

The LHWCA provides an exclusive remedy for an injured employee against his employer.  *See* 33 U.S.C. § 905(a).  When a covered employee sues under the LHWCA, the employee is entitled to recovery under the statutory workers' compensation scheme set

forth therein, but is not entitled to proceed in tort against his employer. *Id.* If Alleman, Parker, and Hollier were "borrowed employees" of W&T, then W&T would be entitled to invoke the exclusive remedy provision of LHWCA.  The exclusive remedy provision "give[s] borrowing employers a shield from tort liability from their borrowed employees under LHWCA." *Melancon v. Amoco Production*, 834 F.2d 1238, 1244 n.10 (5th Cir.), *modified on reh'g*, 841 F.2d 572 (5th Cir. 1988) (citation omitted).  Furthermore, under *Ketchum v. Gulf Oil Corp.*, 798 F.2d 159 (5th Cir. 1986), the LHWCA's exclusive remedy provision would insulate W&T from third-party indemnification claims based on tort theories.  *Id.* at 161; *see also* 1 Thomas J. Schoenbaum, *Admiralty & Maritime Law* § 7-14 (4th ed. 2007).  Thus, if the Court finds that Alleman, Parker, and Hollier were borrowed servants of W&T, then W&T is entitled to summary judgment on Omni's tort-based indemnity and contribution claims.[1]

The Fifth Circuit has established a nine-part test for determining when the borrowed employee doctrine applies:

1.   Who has control over the employee and the work he is performing, beyond mere suggestion of details or cooperation?

---

[1] W&T's motion does not address Omni's contract-based claims for indemnification under the Master Service Contract.

2.    Whose work is being performed?

3.    Was there an agreement, understanding, or meeting of
      the minds between the original and the borrowing
      employer?

4.    Did the employee acquiesce in the new work situation?

5.    Did the original employer terminate his relationship
      with the employee?

6.    Who furnished tools and place for performance?

7.    Was the new employment over a considerable length of
      time?

8.    Who had the right to discharge the employee?

9.    Who had the obligation to pay the employee?

*Melancon*, 834 F.2d at 1244 (citing *Ruiz v. Shell Oil Co.*, 413
F.2d 310 (5th Cir. 1969))[2].

In determining borrowed servant status for purposes of tort
immunity under LHWCA, the Fifth Circuit has stressed the fourth,
fifth, sixth, and seventh factors.[3]  *Melancon*, 834 F.2d at 1245

_____

[2] Some courts apply a ten-factor approach, in which the
final factor examines who actually hired the employee.  *See U.S.
Fire Ins. Co. v. Miller*, 381 F.3d 385, 388-91 (5th Cir. 2004).
Although the Court applies the traditional nine-factor test, it
does take into account that the nominal employers in this case
were the entities that actually hired the employees in reaching
its conclusion.

[3] The tort immunity approach contrasts with the court's
approach to borrowed employee status in the *respondeat superior*

n.12 (citing *Gaudet*, 562 F.2d at 356-57).  The concern is whether
"the second employer [was] itself responsible for the working
conditions experienced by the employee, and the risks inherent
therein . . . [and whether] the employment with the new employer
[was] of such duration that the employee could be reasonably
presumed to have evaluated the risks of the work situation and
acquiesced thereto." *Gaudet*, 562 F.2d at 357.  Thus, for each of
the helicopter passengers whose injuries are the subject of this
litigation, the Court must consider each of the nine above
factors, giving special consideration to the fourth, fifth,
sixth, and seventh factors.

### B.   Thomas Alleman

#### 1.   Control

The first inquiry is control.  The evidence establishes that
W&T exerted significantly greater control over Alleman than did
his nominal employer, D&C.  Alleman has testified that, during
his employment with D&C, the only work he performed was on behalf
of W&T.  (R. Doc. 77-6, Ex. C at pp. 92-93).  Alleman worked on
tasks identified by W&T.  *Id.*  Alleman further testified that W&T
field foreman Michael Lofton acted as his supervisor and gave him

---

context.  In such cases, the court emphasizes the "control"
factor over the others.  *Melancon*, 834 F.2d at 1245 n.12.

instructions.  *Id.* at pp. 93-94.  W&T provided all of Alleman's transportation and meals while he was working offshore.  *Id.* at pp. 94-95.  In fact, Alleman testified that he had no contact whatsoever with D&C during his 14-day work "hitches," and that he also received no work instructions from D&C during those times.  *Id.* at p. 97.  Accordingly, the Court finds that this factor favors a finding of borrowed servant status.

### 2.   Whose work?

It is undisputed that the only work Alleman performed while he was employed by D&C was on behalf of W&T.  *Id.* at pp. 92-93.  Accordingly, the Court finds that this factor favors a finding of borrowed servant status.

### 3.   Agreement

The Master Service Contract in effect between W&T and D&C at the time of Alleman's hiring specifically provides that "[i]t is expressly understood and agreed that Contractor is an independent contractor and that neither Contractor nor Contractor's principals, partners, employees or subcontractors are servants, agents or employees of W&T."  (R. Doc. 77-7, Ex. G, ¶ 2.1).  In the absence of countervailing evidence, such a provision would suffice to establish that it was the intention of the parties

that Alleman was not a borrowed servant of W&T.

The evidence, however, suggests that the provision may not represent the full agreement.  The Fifth Circuit has held that "[t]he reality at the worksite and the parties' actions in carrying out a contract . . . can impliedly modify, alter, or waive express contract provisions." *Melancon*, 834 F.2d at 1245. The parties "cannot automatically prevent a legal status like 'borrowed employee' from arising merely by saying in a provision in their contract that it cannot arise." *Id.*  Thus, when the parties understand that the employee will be taking instructions from the purported borrowed employer, borrowed employee status attaches.  *Id.*  In this case, it is clear that the parties understood that Alleman would take his instructions not from his nominal employer but from W&T.  (R. Doc. 77-6, Ex. C at pp. 92-93; R. Doc. 77-7, Ex. F, ¶ 9).  Alleman was hired by D&C but had no contact with his nominal employer while working offshore.  (R. Doc. 77-6, Ex. C at p. 97).  The written terms of the master contract are the only evidence that support the conclusion that the parties did not intend for Alleman to operate under the auspices of W&T.  Accordingly, the Court finds that consideration of this factor supports a finding of borrowed servant status.


    4.    Did the employee acquiesce?

11

Every indication is that Alleman acquiesced in the work arrangement.  He knew at the outset that he would be working for W&T.  (R. Doc. 77-6, Ex. C at p. 92).  During Alleman's two-to-three month employment with D&C, there is no evidence that he complained to D&C or W&T about the arrangement.  (*See, e.g.,* R. Doc. 77-7, Ex. F, ¶ 10).  Accordingly, the Court finds that consideration of this factor supports a finding of borrowed servant status.

     5.   Did the original employer terminate its relationship?

The Fifth Circuit has noted that this factor does not ask whether the nominal employer had formally terminated its relationship with the employee.  *Melancon*, 834 F.2d at 1246. Such a requirement would eviscerate the borrowed servant doctrine.  *Id.*  Instead, the inquiry "should focus on the lending employer's relationship with the employee while the borrowing occurs."  Id. (quoting *Capps v. N.L. Baroid-NL Industries, Inc.*, 784 F.2d 615, 617-18 (5th Cir. 1986)).  When the relationship is "nominal at best," this factor favors borrowed servant status. *Melancon*, 834 F.2d at 1246.  In this case, there was no contact between D&C and Alleman while he was working for W&T.  (R. Doc. 77-6, Ex. C at p. 97).  D&C did not supervise or otherwise give

12

Alleman instructions.  *Id.* at pp. 97, 92-93.  Accordingly, the
Court finds that consideration of this factor favors a finding of
borrowed servant status.


      6.  Who furnished tools and place?

It is not disputed that W&T furnished all tools,
transportation, locations, meals, and lodging for Alleman while
he was employed with D&C.  (R. Doc. 77-6, Ex. C at pp. 94-96; R.
Doc. 77-5, ¶¶ 67-72; R. Doc. 95-3, ¶¶ 67-72).  Accordingly, the
Court finds that consideration of this factor favors a finding of
borrowed servant status.


      7.  Length of time?

Alleman worked for D&C and W&T for only two or three months
before his accident.  The Fifth Circuit has held that, although a
long employment relationship may militate in favor of borrowed
servant status, the converse is not true.  *See Capps*, 784 F.2d at
618.  Thus, when an employee's injuries occur on the first day of
his employment, this factor does not negate a finding of borrowed
servant status.  *Id.*  Accordingly, the Court finds that this
factor does not support a finding of borrowed servant status but
has only neutral application.

8.   Right to discharge

The inquiry under this factor is not which entity had the power to terminate the injured plaintiff's employment outright, but whether the borrowing employer had the authority to terminate the employee's services with itself.  *Melancon*, 834 F.2d at 1246. Michael Lofton's declaration supports the conclusion that W&T had previously requested that D&C withdraw particular contractors, and that it would have done so had it perceived such a need in Alleman's case.  (R. Doc. 77-7, Ex. F, ¶¶ 11-14).   Alleman, on the other hand, said that he did not know whether Lofton had the authority to request that he stop working for W&T.  (R. Doc. 95-2, Ex. 1, pp. 97-98).   This statement is not inconsistent with Lofton's declaration.   Lofton could have the authority to terminate Alleman's service to W&T without Alleman's knowing about it.   The Court also notes that there is no dispute that D&C would have honored a request by W&T to have Alleman withdrawn from the worksite.  (R. Doc. 77-5, ¶¶ 75-78; R. Doc. 95-3, ¶¶ 75-78).   Consequently, the Court finds that this factor supports a finding of borrowed servant status.

9.   Obligation to pay

Again, this factor does not ask from whose bank account the employee's actual paychecks originate.   When the borrowing

14

employer pays the nominal employer an hourly rate for the employee, from which the nominal employer then pays the employee a lower hourly rate, the Fifth Circuit has held that this factor supports a finding of borrowed servant status.  *Melancon*, 834 F.2d at 1246.

In this case, it is clear that D&C paid Alleman directly. Alleman would complete time tickets based on the hours he worked for W&T, using W&T billing codes, and then get approval for those tickets from the individual in charge of the platform.  (R. Doc. 77-6, Ex. C at pp. 96-97).  After approval, the tickets were submitted to D&C "for further processing, including billing to W&T."  (R. Doc. 77-7, Ex. F, ¶ 17).  It is unclear from the evidence whether this means that D&C billed W&T for Alleman's services on a marked-up hourly basis, or whether W&T paid D&C in some other way.  In any event, the Court cannot conclude from this evidence that W&T "in effect" had the obligation to pay Alleman for his services.  Accordingly, the Court finds that this factor does not favor a finding of borrowed servant status.

### 10.  Conclusion

Of the nine *Ruiz* factors, only the seventh and ninth do not support a finding of borrowed servant status.  The seventh factor has only neutral application, because of Alleman's brief tenure

with D&C and W&T.  The Fifth Circuit has given particular weight
to the fourth, fifth, sixth, and seventh factors; three of these
support borrowed servant status and the fourth is neutral.  The
weight of the factors therefore favors a finding of borrowed
servant status.  Accordingly, the Court finds that Alleman was a
borrowed servant of W&T for purposes of LHWCA liability.

### C.  **Mark Parker**

#### 1.  Control

It is clear that W&T exerted control over Parker just as it
had for Alleman.  Parker reported to Michael Lofton and received
all of his orders from him.  (R. Doc. 76-14, Ex. D at pp. 150-51,
152-53).  During his two-week stays offshore working for W&T,
Parker never had occasion to contact Baker for any purpose.  *Id.*
at pp. 152-53.  Parker acted under the exclusive control of W&T.
(R. Doc. 76-15, Ex. F, ¶ 20-24).  In fact, when asked for whom he
was working at the time of the accident, Parker responded "W&T."
(R. Doc. 76-13, Ex. D at p. 8).  There is no evidence that
creates an issue of fact as to W&T's control over Parker.
Accordingly, the Court finds that consideration of this factor
favors a finding of borrowed servant status.

#### 2.  Whose work?

It is undisputed that the work performed by Parker during his offshore service was that of W&T and that Parker was working for W&T at the time of the accident.  (R. Doc. 76-11, ¶¶ 43-56; R. Doc. 95-5, ¶¶ 43-56).  Accordingly, the Court finds that this factor favors a finding of borrowed servant status.

### 3.   Agreement

As was the case with Thomas Alleman, *supra*, the Master Service Contract under which Baker supplied contractors to W&T expressly provides that Baker's employees are not employees of W&T.  (R. Doc. 76-15, Ex. G, ¶ 2.1).  Nevertheless, considering the realities of the worksite, it is clear that the parties intended to modify this portion of the agreement by giving functional control over Parker to W&T.  As noted above, W&T supervised Parker and Baker did not.  Accordingly, the Court finds that consideration of this factor supports a finding of borrowed servant status.

### 4.   Did the employee acquiesce?

It is undisputed that Parker worked for several years in W&T's fields, that he did not call Baker for work instructions, and that he did not complain to his supervisor, Michael Lofton, about his work situation.  (R. Doc. 76-11, ¶¶ 62-65; R. Doc. 95-

17

5, ¶¶ 62-65).  Accordingly, the Court finds that consideration of this factor supports a finding of borrowed servant status.

>    5.    Did the original employer terminate its
>          relationship?

As discussed, *supra*, the inquiry under this factor is into the extent of the nominal employer's relationship with the employee during the employee's service to the borrowing employer. The Court has already found that Parker had no contact with Baker while he was offshore working for W&T and that Parker received all of his instruction and supervision from W&T's supervisors. Baker's relationship with Parker was therefore "nominal at best." *Melancon*, 834 F.2d at 1246.  Accordingly, the Court finds that consideration of this factor supports a finding of borrowed servant status.

>    6.    Who furnished tools and place?

It is not disputed that W&T provided the tools and workplace for Parker.  (R. Doc. 76-11, ¶¶ 68-72; R. Doc. 95-5, ¶¶ 68-72). Accordingly, the Court finds that consideration of this factor supports a finding of borrowed servant status.

>    7.    Length of time?

Although it is unclear exactly how long Parker worked in W&T's offshore fields, the undisputed evidence establishes that it was for "a number of years." (R. Doc. 76-13, p. 149). This establishes a long enough work relationship between Parker and W&T to favor a finding of borrowed servant status. A "number of years" is a period of time, greater than two years, in which one would expect an employee or employer to have terminated a disagreeable or untenable work arrangement. Accordingly, the Court finds that consideration of this factor supports a finding of borrowed servant status.

8.   Right to discharge

As the Court discussed, *supra*, this factor asks whether the borrowing employer had the power to terminate the employee's service with itself. It is undisputed that W&T had the authority to terminate Parker's service to itself. (R. Doc. 76-11, ¶¶ 75-79; R. Doc. 95-5, ¶¶ 75-79). Accordingly, the Court finds that consideration of this factor supports a finding of borrowed servant status.

9.   Obligation to pay

As with Alleman, the Court cannot determine the exact nature of the billing relationship between Baker and W&T.  Parker

submitted his time tickets for review and approval by W&T's field supervisor, Michael Lofton.  (R. Doc. 76-14, p. 153; R. Doc. 76-15, Ex. F, ¶¶ 31-32).  These tickets were then submitted to Baker for billing purposes.  *Id.*  From this evidence, the Court cannot determine whether the billing arrangement between Baker and W&T resembled an arrangement in which W&T was, in effect, paying Parker directly.  Accordingly, the Court finds that this factor does not support a finding of borrowed servant status.

### 10.  Conclusion

Of the nine *Ruiz* factors, only the ninth does not support a finding of borrowed servant status.  Thus, the overwhelming weight of the factors favors a finding of borrowed servant status.  Accordingly, the Court finds that Parker was a borrowed servant of W&T for purposes of LHWCA liability.

### D.  Bert Hollier

#### 1.  Control

It is clear that W&T exerted control over Hollier, just as it had over Parker.  Parker reported to Michael Lofton while in the field.  (R. Doc. 90-6, Ex. E, ¶ 6).  Michael Lofton indicates in his declaration that Hollier did not receive work instructions or have any contact with his nominal employer, Baker, while in

20

the field.  *Id.* at ¶ 7.  The evidence indicating W&T's control over Hollier is undisputed.  (R. Doc. 90-3, ¶¶ 1-31, 35-47, 49; R. Doc. 95-4, ¶ 1-31, 35-47, 49).  Accordingly, the Court finds that consideration of this factor favors a finding of borrowed servant status.

        2.    Whose work?

    It is undisputed that the work performed by Hollier during his offshore service was that of W&T and that Hollier was working for W&T at the time of the accident.  (R. Doc. 90-3, ¶¶ 50-62; R. Doc. 95-4, ¶¶ 50-62).  Accordingly, the Court finds that this factor favors a finding of borrowed servant status.

        3.    Agreement

    As was the case with Alleman and Parker, *supra*, the Master Service Contract under which Baker supplied contractors to W&T expressly provides that Baker's employees are not employees of W&T.  (R. Doc. 90-6, Ex. H, ¶ 2.1).  Nevertheless, considering the realities of the worksite, it is clear that the parties intended to modify this portion of the agreement by giving functional control over Hollier to W&T.  As discussed above, W&T supervised Hollier and Baker did not.  Accordingly, the Court finds that consideration of this factor supports a finding of

21

borrowed servant status.

      4.   Did the employee acquiesce?

It is undisputed that Hollier worked for "a number of years" in W&T's fields and that he never complained to Lofton about his work situation, duties, responsibilities, or assignments.  (R. Doc. 90-3, ¶¶ 68, 71; R. Doc. 95-4, ¶¶ 68-71).  The Court interprets Hollier's years of service without complaint as evidence that he acquiesced in his work situation.  Accordingly, the Court finds that consideration of this factor supports a finding of borrowed servant status.

      5.   Did the original employer terminate its relationship?

As discussed, *supra*, the inquiry under this factor is into the extent of the nominal employer's relationship with the employee during the employee's service to the borrowing employer. W&T has presented evidence from Hollier's supervisor that Hollier had no such contact.  There is no dispute that Hollier received work instructions from, and was supervised by, W&T.  Accordingly, the Court finds that consideration of this factor supports a finding of borrowed servant status.

6.   Who furnished tools and place?

It is not disputed that W&T provided the tools and workplace for Hollier.  (R. Doc. 90-3, ¶¶ 74-78; R. Doc. 95-4, ¶¶ 74-78). Accordingly, the Court finds that consideration of this factor supports a finding of borrowed servant status.

7.   Length of time?

Although it is unclear exactly how long Hollier worked in W&T's offshore fields, the undisputed evidence establishes that it was for "a number of years."  (R. Doc. 90-5, Ex. D, p. 149). As the Court discussed with respect to Parker's service, this establishes a long enough work relationship between Hollier and W&T to favor a finding of borrowed servant status.   Accordingly, the Court finds that consideration of this factor supports a finding of borrowed servant status.

8.   Right to discharge

As the Court discussed, *supra*, this factor asks whether the borrowing employer had the power to terminate the employee's service with itself.  It is undisputed that W&T had the authority to terminate Hollier's service to itself.  (R. Doc. 90-3, ¶¶ 81-84; R. Doc. 95-4, ¶¶ 81-84).  Accordingly, the Court finds that consideration of this factor supports a finding of borrowed

23

servant status.

### 9.   Obligation to pay

As with Alleman and Parker, the Court cannot determine the exact nature of the billing relationship between Baker and W&T. Hollier submitted his time tickets for review and approval by W&T's field supervisor, Michael Lofton.  (R. Doc. 90-6, Ex. E, ¶¶ 25-28).  These tickets were then submitted to Baker for billing purposes.  *Id.*  The Court does not find sufficient evidence to conclude that the arrangement between Baker and W&T was such that W&T was, in effect, paying Hollier directly.  Accordingly, the Court finds that this factor does not support a finding of borrowed servant status.

### 10.   Conclusion

Of the nine *Ruiz* factors, only the ninth does not support a finding of borrowed servant status.  The overwhelming weight of the factors therefore favors a finding of borrowed servant status.  Accordingly, the Court finds that Hollier was a borrowed servant of W&T for purposes of LHWCA liability.

### E.   Summary

As the Court discussed, *supra*, the LHWCA's exclusive remedy

provision insulates borrowing employers from third-party indemnification and contribution claims based on tort theories. *Ketchum*, 798 F.2d at 161.  Because the Court has found that W&T was the borrowing employer of each of the employees in question for purposes of LHWCA liability, the LHWCA bars Omni's tort-based indemnity and contribution claims.  Accordingly, W&T is entitled to summary judgment on Omni's tort-based indemnity and contribution claims.

## III. OMNI'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Omni moves for summary judgment that the general maritime law applies to the personal injury claims of Alleman and Parker and that the *Death on the High Seas Act*, 46 U.S.C. §§ 761-68 (2004) ("DOHSA"), applies to the claims of the Hollier heirs.  As a preliminary matter, the Court notes that the only opposition to the motion has come from the Hollier heirs.  Accordingly, the Court deems the parties to be in agreement that general maritime law applies to the claims against Omni related to the personal injuries of Alleman and Parker.

In the Hollier case, the question is whether DOHSA or OCSLA applies.  If DOHSA applies, plaintiffs' remedies are limited by DOHSA and state law does not apply.  46 U.S.C. § 761 (2004). DOHSA specifically bars recovery of nonpecuniary damages, such as

25

loss of society.  *See Mobil Oil Corp. v. Higginbotham*, 436 U.S. 618, 623-625 (1978); 46 U.S.C. § 762 (2004) (limiting recovery under DOHSA to "fair and just compensation for . . . pecuniary loss.").[4]  If OCSLA is applicable, then Louisiana wrongful death law applies, and damages are not restricted to pecuniary loss. *See Manuel v. City of Jeanerette*, 702 So.2d 709, 714 (La. App. 3rd Cir. 1997).

The applicable version of DOHSA[5] provides a right of action for offshore deaths:

> (a)  Subject to subsection (b), whenever the death of a person shall be caused by wrongful act, neglect, or default occurring on the high seas beyond a marine league from the shore of any State, or the District of Columbia, or the Territories or dependencies of the United States, the personal representative of the decedent may maintain a suit for damages in the district courts of the United States, in admiralty, for the exclusive benefit of the decedent's wife, husband, parent, child, or dependent relative against the vessel, person, or corporation which would have been liable if death had not ensued.

---

[4] DOHSA was repealed and amended on October 6, 2006. Because the events at issue in this case occurred in 2004, the Court applies the version of DOHSA that was in effect at the time.  The new version of DOHSA permits the recovery of nonpecuniary damages, defined as damages for the loss of care, comfort, and companionship, when the death resulted from a commercial aviation accident occurring on the high seas more than twelve nautical miles from the shore. *Death on the High Seas Act*, Pub. L. No. 109-304, § 30307(a) & (b), 120 Stat. 1485, 1512 (2006).

[5] *See* note 4, *supra*.

> (b)   In the case of a commercial aviation accident, whenever the death of a person shall be caused by wrongful act, neglect, or default occurring on the high seas 12 nautical miles or closer to the shore of any State, or the District of Columbia, or the Territories or dependencies of the United States, this chapter shall not apply and the rules applicable under Federal, State, and other appropriate law shall apply.

46 App. U.S.C. § 761 (2004).  Thus, DOHSA applies to aviation deaths that occur more than 12 nautical miles from shore.  The accident in this case occurred at W&T's Ship Shoal 130-E platform, which is more than twelve nautical miles from the coast of Louisiana.  (R. Doc. 78-6).

The Hollier heirs argue that the Outer Continental Shelf Lands Act (OCSLA), and its application of state law as surrogate federal law, applies.  OCSLA provides for the application of state law, to the extent it is not inconsistent with federal law, as follows:

> 1.   The Constitution and laws and civil and political jurisdiction of the United States are extended to the subsoil and seabed of the outer Continental Shelf and to all artificial islands, and all installations and other devices permanently or temporarily attached to the seabed, which may be erected thereon for the purpose of exploring for, developing, or producing resources therefrom, or any such installation or other device (other than a ship or vessel) for the purpose of transporting such resources, to the same extent as if the outer Continental Shelf were an area of exclusive Federal jurisdiction located within a State: Provided, however, That mineral leases on the

27

outer Continental Shelf shall be maintained or
issued only under the provisions of this
subchapter.

2.

(A) To the extent that they are applicable and not
inconsistent with this subchapter or with other
Federal laws and regulations of the Secretary now
in effect or hereafter adopted, the civil and
criminal laws of each adjacent State, now in
effect or hereafter adopted, amended, or repealed
are declared to be the law of the United States
for that portion of the subsoil and seabed of the
outer Continental Shelf, and artificial islands
and fixed structures erected thereon, which would
be within the area of the State if its boundaries
were extended seaward to the outer margin of the
outer Continental Shelf, and the President shall
determine and publish in the Federal Register such
projected lines extending seaward and defining
such area.  All of such applicable laws shall be
administered and enforced by the appropriate
officers and courts of the United States.  State
taxation laws shall not apply to the outer
Continental Shelf.

43 U.S.C. § 1333.

Beginning with *Rodrigue v. Aetna Casualty and Surety Co.*,
395 U.S. 352 (1969), the Supreme Court and lower courts have used
shifting rationales to determine which statute applies to a fatal
accident near an artificial island.  *Rodrigue* involved the
accidental deaths of platform workers in the course of their
ordinary work on offshore drilling platforms.  *Rodrigue*
established that Congress intended for OCSLA to apply to deaths
actually occurring on offshore platforms, to the exclusion of
DOHSA.  *Id.* at 365-66.  The Court stated that OCSLA deliberately

28

treated platforms as artificial islands instead of as vessels "in part because men working on these islands are closely tied to the adjacent State . . . unlike transitory seamen to whom a more generalized admiralty law is appropriate." *Id.* at 355.  Then, in *Offshore Logistics, Inc. v. Tallentire*, 477 U.S. 207 (1986), the Supreme Court held that the deaths of two offshore platform workers in a helicopter crash in the high seas fell under DOHSA. *Id.* at 218-19.  The Court reasoned that the deaths occurred "on the high seas" and more than twelve nautical miles from shore, thus satisfying the express provisions of DOHSA.  *Id.*  The Court also found that traditional maritime principles supported the application of admiralty law over OCSLA.  *Id.*  Applying the "locality plus" test, the Court reasoned that the helicopter crash occurred on the high seas and when the helicopter was engaged in the traditional maritime activity of ferrying passengers between artificial islands and the shore.  *Id.*  The Court rejected the notion that OCSLA applied simply because the decedents were platform workers who had a special relationship to the shore, regardless of the location of the accident.  Rather, the Court emphasized that two of its earlier cases that applied OCSLA to the deaths of platform workers did so "not because of the status of the decedents but because of the proximity of the workers' accidents to the platforms and the fact that the

29

fatalities were intimately connected with the decedents' work on the platforms." *Id.* at 219.

A third case, *Smith v. Pan Air Corp.*, 684 F.2d 1102 (5th Cir. 1982), is instructive.  In that case, a helicopter pilot was killed when his rotor struck a crane ball attached to a fixed platform offshore, and the helicopter plunged into the sea.  *Id.* at 1105.  The Fifth Circuit stated that the location of the negligent act was not conclusive of the inquiry, and that the location of the injury and the function of the decedent at the time of death were more important.  *Id.* at 1111.  Thus, the Court found DOHSA applicable because the decedent was killed only when the helicopter plunged into the sea, and he was a helicopter pilot engaged in traditionally-maritime transportation, not a platform worker who was only incidentally aboard a vessel.  *Id.*

Lower courts have reached different results on similar facts when events straddle the statutory reach of both statutes. *Compare Garrett v. Air Logistics, Inc.*, 1996 WL 492300 (E.D. La. 1996), *with Browning v. Petroleum Helicopters, Inc.*, 1997 WL 129390 (E.D. La. 1997).  In each of the cited cases, platform workers were injured or killed when a helicopter in which they were passengers crashed into the sea after coming into contact with an offshore platform.  In *Garrett*, the court reasoned that the helicopter was being used to transport personnel at the time

30

of the accident, which is a traditional maritime activity, and that the decedent drowned as a result of the submersion of the helicopter in the high seas. *Id*. at *1. The court found that these maritime factors predominated over the role the platform played in the accident, which was essentially passive. The court acknowledged, as the Fifth Circuit did in *Smith*, that there are cases in which courts have applied OCSLA to incidents in which platform workers were not actually injured or killed until they fell, jumped, or were thrown into the surrounding seas. *Garrett*, 1996 WL 492300 at *2. As to these cases, the court observed that courts were more likely to apply OCSLA when the "incident is due to the use or misuse of equipment aboard the platform and the impact or contact with a vessel or navigable waters is simply incidental." *Id*. at *2.

    In *Browning*, on the other hand, the Court considered *Smith* and found that the plaintiff's status as a platform worker who was only incidentally aboard the helicopter favored the applicable of OCSLA. *Browning*, 1997 WL 129390 at *3.

    The Court finds *Garrett* to be the more persuasive approach because it is more consistent with Supreme Court authority. The Supreme Court in *Tallentire* indicated that when a platform worker dies in a helicopter crash in the high seas, it is not his status as a platform worker that controls. Rather, in reviewing its

31

past cases that applied OCSLA instead of DOHSA, the Court said that the application of OCSLA hinged on the proximity of the accident to the platform and the intimate connection between the fatalities and the decedents' work on the platform.  The *Garrett* court was getting at the same point when it distinguished cases that involved accidents caused by activities on the platforms, such as misuse of equipment.  Here, as in *Garrett*, the fatality did not arise out of the decedent's work on platform operations.  Rather, he was a passenger in a helicopter, like the workers in *Garrett* and *Tallentire*, being transported between artificial islands or between an island and the shore.  As in *Tallentire* and *Garrett*, the helicopter was engaged in the traditional maritime activity of transporting passengers over the seas, and plaintiffs' decedent was killed when the helicopter crashed into the sea.  Overall, the place of the injury, the relationship of the use of the helicopter to traditional maritime activity and the lack of a close nexus between decedent's death and his actual work on the platform convince the Court that DOHSA and maritime law apply to the claims of the Hollier heirs.[6]

---

[6] The Hollier heirs also argue that the Court has already determined that OCSLA applies.  Insofar as the Court has applied OCSLA, it has done so only to the contract between W&T and Omni, which the Court concluded was not a maritime contract.  (R. Doc. 74-2).

**III. CONCLUSION**

For the reasons stated above, W&T's three motions for partial summary judgment on borrowed servant status are GRANTED. Omni's motion for partial summary judgment is GRANTED.

New Orleans, Louisiana, this  9th  day of March, 2007.

_____
SARAH S. VANCE
UNITED STATES DISTRICT JUDGE